UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DM MANAGER LLC, McALLISTER
ACCEPTANCE CORPORATION, MOTOR
ACCEPTANCE COMPANY, LLC, MOTOR
FUNDING SERVICES, LLC, RANDOM
HOLDINGS, INC., *and* DOUG McALLISTER,

Plaintiffs,

– *against* –

FIDELITY NATIONAL INFORMATION SERVICES,
INC., FIDELITY INFORMATION SERVICES, LLC,
*and* FIS ePROCESS INTELLIGENCE LLC,

Defendants.

**OPINION & ORDER**

23-cv-00617 (ER)

---

RAMOS, D.J.:

Plaintiffs DM Manager LLC, McAllister Acceptance Corporation, Motor

Acceptance Company, LLC, Motor Funding Services, LLC ("MFS"), Random Holdings,

Inc., and Doug McAllister have brought several claims against Defendants Fidelity

National Information Services, Inc., Fidelity Information Services, LLC ("FIS"), and FIS

eProcess Intelligence LLC, alleging that Defendants breached a contract with Plaintiffs

and fraudulently interfered with Plaintiffs' business.  Doc. 1-2.  Defendants have moved

to dismiss the Second Amended Complaint ("SAC") in its entirety or, in the alternative,

to transfer the case to the U.S. District Court for the Middle District of Florida.  Doc. 15.

For the reasons set forth below, the motion to dismiss is GRANTED.

## I.     BACKGROUND

Plaintiffs are a set of related companies that are part of a startup venture in the

automobile lease and finance sector.  DM Manager LLC is a single member limited

liability company wholly owned by Doug McAllister.  Doc. 1-2 ¶ 1.  The other

plaintiffs—McAllister Acceptance Corporation, Motor Acceptance Company, MFS, and

Random Holdings—are all wholly owned by Doug McAllister through DM Manager.  *Id.*
¶¶ 2–5.

FIS is a leader in financial technology services, providing information technology
and business process services to companies that provide financial services such as loans.
*Id.* at 91–92.  FIS helps its clients outsource, streamline, and integrate their "back office"
needs.  FIS has long provided banking and payments technology that replaces the
traditional infrastructure, communication, and customer service requirements of lending
companies.  *Id.*  In essence, FIS and other financial technology firms provide a menu of
software and services products that can be configured to the needs of a particular financial
services company.

MFS is a new auto finance company.  It provides high end vehicle leases for
automotive dealer groups.  *Id.*  MFS, along with the other plaintiffs, had a unique idea for
a business model that brings together dealer groups so they benefit from combining
securities portfolios and can expand their business.  *Id.* at 92; *see also id.* ¶ 31.  To
increase efficiency and lower operating costs, MFS engaged the business process services
of FIS.  *Id.* at 91.  MFS and FIS entered into an agreement to customize FIS' existing
back-end support products to fit the needs of MFS' novel lease financing model and
create a unified platform for auto lease financing.  *Id.* at 91, 94.  That contract and
subsequent events are at issue here.

**A.  Information Technology Services Agreement**

Plaintiffs[1] developed a new methodology for auto financing, leasing, and
associated services called "MAC SYSTEMS."  *Id.* ¶ 29.  Plaintiffs initially engaged in
negotiations with FISERV, Inc, a direct competitor of FIS, to enter into a vendor
relationship to further develop the MAC SYSTEMS model.  *Id.* ¶ 32–35, 44.  Plaintiffs

---

[1] The SAC refers to "Plaintiffs" and "Defendants" generally.  For the sake of clarity, when referring to the
parties collectively, or when the SAC does not identify which specific parties acted, the Court will use the
terms "Plaintiffs" and "Defendants."

and FISERV purportedly entered into a confidentiality agreement in 2010. *Id.* ¶ 32.
Plaintiffs assert that FISERV planned to develop a technology platform using the MAC
SYSTEMS model and FISERV's own Auto Loan Origination System. *Id.* ¶¶ 33, 37–38.
FISERV provided Plaintiffs with a detailed agreement for specific deliverables, including
the completion of an auto leasing platform utilizing the MAC SYSTEMS model in ninety
days. *Id.* ¶¶ 36, 38.  Plaintiffs allege that they were close to signing the agreement with
FISERV in 2012. *Id.* ¶ 35.

Before an agreement was signed with FISERV, however, FIS began negotiating
with Plaintiffs, offering what Plaintiffs characterize as a "company-to-company
partnership" rather than a vendor relationship. *Id.* ¶¶ 41, 47.[2]  Plaintiffs allege that FIS
promised to deliver a better product than the one anticipated by FISERV. *Id.* ¶ 44.  One
of the plaintiffs, Random Holdings, then entered into a confidentiality agreement with
FIS. *Id.* ¶ 40.  Later, another of the plaintiffs, MFS, entered into an Information
Technology Services Agreement ("Services Agreement") with FIS on September 30,
2013. *Id.* at 94, 136.  The Services Agreement proposed to integrate FIS' back-end
processes and technology into one comprehensive technological platform called the
"New Auto Fintech Platform," customized to fit the MAC SYSTEMS model. *Id.* ¶¶ 48–
49.

The Services Agreement specified that FIS—either itself or through a third
party—would provide its various auto finance processing services to help MFS
implement its MAC SYSTEMS model. *Id.* at 116.  These services are all elements of the
business process and include lease origination services, back office services,[3] call center
services, collection services, staffing, print and mail services, and document imaging

---

[2] The agreement ultimately entered into by MFS and FIS, however, specifies that MFS was to be a client of
FIS, with FIS providing the client with the agreed upon services.  Doc. 1-2 at 94.

[3] Back office services include customer account setup, bill maintenance, reporting, and processing physical
correspondence.  Doc. 1-2 at 119.

services. *Id.* at 117–24. FIS was to customize its current auto finance servicing product, AutoSuite Virtual Back Office solution ("AutoSuite"), to meet MFS' specific needs. *Id.* ¶ 49; *see also id.* at 91. The Services Agreement further provided for MFS to contract with a third party to use that third party's software for processing lease applications and for FIS to contract to integrate it with the other services provided by FIS into the final product platform. *Id.* at 117. The original timeline proposed that FIS meet certain deliverables within 120 days. *Id.* ¶¶ 71–72. FIS issued a press release documenting the agreement on October 28, 2013. *Id.* at 91.

Plaintiffs characterize the Services Agreement as offering them "worldwide exclusive rights" to distribute and sell the platform. *Id.* ¶¶ 55–56. Plaintiffs allege that the exclusivity provision would further preclude Defendants from offering the platform or any similar product to the industry at large. *Id.* ¶ 57. In terms of exclusivity, however, the Services Agreement itself states only that FIS will be MFS' "sole and exclusive provider" of the contracted services. *Id.* at 94. And it specifies that FIS shall not solicit or contract for business with any competitors of MFS who are also dealer groups in auto lease financing services. *Id.* at 129–30.

Plaintiffs further allege that Defendants required Plaintiffs' confidential ideas and intellectual property to develop the platform. *Id.* ¶ 81. Indeed, such knowledge of information systems, the identities of third-party vendors, and the MAC SYSTEMS model was shared with Defendants during development meetings. *Id.* ¶¶ 80–81, 100.

### B. Alleged Breach and Fraudulent Conduct

The purpose of the Services Agreement was for FIS to integrate AutoSuite, an FIS product, with MFS' MAC SYSTEMS. *Id.* ¶¶ 49, 69–70. But Plaintiffs allege that FIS had only pieces of the necessary technology and had not yet developed the system. *Id.* ¶¶ 70, 89. FIS allegedly redrew and extended the delivery deadlines at a meeting on November 13, 2013. *Id.* ¶ 74.

4

In December 2013, Plaintiffs met with Credit Management Solutions, Inc.
("CMSI"), to discuss integrating CMSI's services into the platform.  *Id.* ¶ 92.  CMSI
provides software that automates the consumer credit process for the origination of a
lease.  *Id.* ¶¶ 90–92, 100.  Plaintiffs and CMSI entered into a confidentiality agreement in
December 2013 and then finalized a statement of work in February 2014.  *Id.* ¶¶ 92–94.[4]
Following that agreement, however, on April 14, 2024, FIS issued a press release
announcing its acquisition of CMSI.  *Id.* ¶ 94; *see id.* at 160.  FIS planned for CMSI to
contribute its loan origination technology to FIS' AutoSuite services, which were then to
be integrated into the New Auto Fintech Platform.  *Id.* ¶ 96.  Plaintiffs allege that FIS then
prevented CMSI from completing development work related to customizing the platform
for MFS.  *Id.* ¶¶ 97–99, 101.

In the beginning of 2015, FIS received two industry awards based on its
AutoSuite solution and its acquisition and integration of CMSI loan services technology
to improve the functionality of FIS products.  *Id.* at 163–65.  Plaintiffs allege that
between then and 2016, FIS not only integrated CMSI technology into AutoSuite but also
completed and released for itself a replica version of the New Auto Fintech Platform it
was supposed to be developing for MFS.  *Id.* ¶¶ 102, 115, 124.  The product, which
Plaintiff refers to as the Replica Auto Fintech Platform, is called FIS Ambit Asset
Finance.  *Id.* ¶¶ 124–127.  An October 2016 article about the rollout of Ambit Asset
Finance described it as end-to-end lease financing technology.  *Id.* ¶¶ 125–26; *see also id.*
at 169.  Marketing materials for the product did not reference to the AutoSuite system or
CMSI integration.  *Id.* at 174–175.  Plaintiffs allege that the development of this platform
was facilitated by FIS' access to MFS' trade secrets and components of the MAC
SYSTEMS model.  *Id.* ¶¶ 100, 127, 129, 158.  FIS allegedly distributed Ambit Asset
Finance to what Plaintiffs characterize as Plaintiffs' exclusive customer base, and it

_____

[4] The confidentiality agreement and statement of work do not appear in the documents appended to the
SAC.

continued to increase its market share, garnering official industry recognition of the platform in 2016.  *Id.* ¶¶ 158–60.

Plaintiffs assert that they were unaware of FIS' actions during this time.  *Id.* ¶¶ 101, 160.  Plaintiffs allege that FIS continued to insist during development meetings that it was working on the deliverables while it actually delayed performance and failed to dedicate staff to the project.  *Id.* ¶¶ 112–13, 119–120.  FIS provided MFS with FIS employees and third-party vendors to deliver the New Auto Fintech Platform, but Plaintiffs claim they were ineffective in completing the project.  *Id.* ¶¶ 122–23.

In the meantime, FIS attempted to terminate the Services Agreement based on invoices that MFS failed to pay for managed services, cloud data management, and compliance work.  *Id.* ¶¶ 142–47.  Plaintiffs allege that these unpaid invoices were fabricated for services that were never delivered.  *Id*. at 142.  According to the SAC, FIS never delivered the New Auto Fintech Platform or any system of any kind to MFS, nor did it provide any back-end services.  *Id.* ¶¶ 149–150.  FIS then assured MFS that the Platform would be ready upon MFS "signing its initial [auto] dealer" to use it.  *Id.* at 179; *see also id.* ¶¶ 154–155.  Plaintiffs allege that they lost the chance to engage in automotive lease and financing business because of FIS' failure to deliver the New Auto Fintech Platform.  *Id.* ¶¶ 167–71.

Both parties engaged in mediation on November 22, 2017, which was unsuccessful.  *Id.* ¶ 173.  It was only then that Plaintiffs allege that they discovered the existence of Ambit Asset Finance, which "Defendants hid up to that moment."  *Id.* ¶¶ 174, 177.  Although FIS tried to terminate the Services Agreement again, Plaintiffs assert that it remained in place until December 30, 2018, while FIS continued to market and sell Ambit Asset Finance.  *Id.* ¶¶ 175–76.

### C.  Procedural History

Plaintiffs commenced an action in New York state court on October 5, 2022.  Doc. 1 at 2.  The initial complaint was amended twice, and the SAC was filed on December 21,

2022. *Id.* The action was removed to this Court on January 24, 2023, based on diversity of citizenship between the parties in existence when the state court action was filed and an amount in controversy exceeding $75,000. *Id.* at 3.

On April 4, 2023, Defendants moved to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6). Doc. 15. In the alternative, Defendants asked the Court to transfer the case to the Middle District of Florida pursuant to 28 U.S.C. § 1404(a). *Id.*

## II.    LEGAL STANDARD

### A.  Rule 12(b)(1)

Rule 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may consider evidence outside of the pleadings, such as affidavits, to resolve the disputed jurisdictional fact issues. *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170. When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but it does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica C. Schools*, 386 F.3d 107, 110 (2d Cir. 2004).

### B.  Rule 12(b)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must "'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.   DISCUSSION

Plaintiffs bring nine claims in the SAC:  (1) tortious interference with business, (2) intentional fraud, (3) fraudulent concealment, (4) misappropriation of trade secrets, (5) unfair competition/deceptive business practices, (6) misappropriation of confidential information, (7) misappropriation of ideas, (8) misappropriation of skills, and (9) breach of contract. In their motion to dismiss, Defendants argue first that Counts 1 through 8 are duplicative of the breach of contract claim and should be dismissed. As for the remaining breach of contract claim, they argue that Plaintiffs lack standing and that the claim is time-barred and insufficiently pleaded. Furthermore, even if the claims in Counts 1

through 8 are not duplicative, Defendants argue, each claim is either inadequately pleaded, time-barred, or both.  Finally, Defendants move in the alternative to transfer the case to the Middle District of Florida.  Plaintiffs oppose the motion to dismiss and request leave to amend where any deficiencies are found.  Doc. 22.

### A. Duplication Between Tort Claims and Contract Claim

Defendants argue that the tort claims—Counts 1 through 8—are duplicative of the contract claim because they do not "allege a duty independent of the parties' contractual obligations" as required under New York and Florida law.  Doc. 16 at 17.[5]  According to Defendants, the SAC recites the same factual allegations as bases for Plaintiffs' tort and breach of contract claims.  *Id.* at 15.  Plaintiffs concede the "presence of some similar language across the various claims" but argue that this is inconsequential because the "allegations . . . assert[] duties distinct from those in the breach of contract claim."  Doc. 22 at 12.

Under New York law, "when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual" and cannot be repackaged as tort claims.  *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011) (finding that even though the complaint failed to state a claim for breach of contract, the existence of a valid agreement precluded appellant's fraud and other tort claims).  For a tort claim to survive, Plaintiffs must allege the

---

[5] Defendants argue that the operative agreements are governed by Florida law.  Doc. 16 at 12.  And indeed, the Services Agreement provides that "[t]he Agreement shall be governed by the laws of the state of Florida."  Doc. 1-2 at 101.  But Defendants cite both New York and Florida law in discussing all the claims, and they assert that application of either state's law will result in the same outcome.  Doc. 16 at 12. Plaintiffs respond that New York law should apply to the breach of contract claim, but they also cite both states' laws.  Doc. 22 at 9.  Even in the absence of formal agreement as to choice of law, this implied consent is sufficient to establish that New York law applies.  *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (omission in original) (internal quotation marks and citation omitted)); *Spa 77 G L.P. v. Motiva Enters. LLC,* 772 F. Supp. 2d 418, 427 n.5 (E.D.N.Y. 2011) (finding that New York law governed "since the parties rely upon New York law in their brief[s]"); *see also Perrone v. Amato*, No. 09 Civ. 316 (AKT), 2017 WL 2881136, at *23–24 (E.D.N.Y. July 5, 2017) (collecting cases).  The Court will thus assume that New York law applies here.

violation of "a duty 'independent' of [the] duties under the contract" such as a common law duty extraneous to the contract.  *Carvel Corp. v. Noonan*, 350 F.3d 6, 16–17 (2d Cir. 2003).  If the tort alleged is fraud, then it might also survive under one of three fact-specific exceptions:  (1) if there is a separate legal duty other than the duty to perform under the contract; (2) if the fraudulent misrepresentation is collateral to the contract; or (3) if the plaintiff seeks special damages unrecoverable under the contract.  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996); *Minnie Rose LLC v. Yu,* 169 F. Supp. 3d 504, 519–20 (S.D.N.Y. 2016).

As set forth below, Count 1 and Counts 4 through 8 are duplicative of the breach of contract claim and therefore fail.  Even if they were not duplicative, they all independently fail on the merits.  While Counts 2 and 3 are not duplicative, they are likewise insufficiently pleaded.  The breach of contract claim fails on the merits as well.

1. *Count 1:  The Tortious Interference Claim Is Duplicative of the Contract Claim*

Defendants argue that Plaintiffs' claim for tortious interference is based only on the execution and later alleged breach of the Services Agreement between FIS and MFS, and thus is duplicative of the breach of contract claim.  Doc. 16 at 16.  Plaintiffs fail to explain how the claim of tortious interference is not duplicative; instead, they generally respond that "the allegations do indeed speak for themselves, by asserting duties distinct from those in the breach of contract claim," but they do not specify the nature of those duties.  Doc. 22 at 12.  In the absence of additional allegations of distinct or additional duties beyond those in contract, a breach of contract is not actionable in tort.  *See, e.g.*, *Uitz v. Lustigman Firm, P.C.*, No. 13 Civ. 6040 (RMB), 2014 WL 3767056, at *2–3 (S.D.N.Y. July 28, 2014) (dismissing plaintiff's claims for conversion and tortious interference for failure to specify a legal duty independent of the contract.); *see also Poplar Lane Farm,* 449 F. App'x at 59 (explaining that attempts to "repackage" contract claims "as sounding in fraud, conversion, and other torts, as well as unjust enrichment,

implied and quasi contract, and quantum meruit, are generally precluded, unless based on a duty independent of the contract").

Plaintiffs' claim for tortious interference relies on the same facts as the breach of contract claim—that FIS entered into the Services Agreement with no intention of performing.  Doc. 1-2 ¶¶ 185–86.  And Plaintiffs fail to specify a duty to perform outside of those required by the contract.  *Id.*  The SAC refers to Plaintiffs' ongoing relationship with FISERV, but it does not allege any duty FIS had with respect to that relationship.  *Id.* ¶ 184.  So Plaintiffs have failed to allege a breach of duty distinct from the breach of contract, and Count 1 cannot survive alongside a breach of contract claim.

### 2.  Counts 2 and 3:  The Intentional Fraud and Fraudulent Concealment Claims Are Not Duplicative of the Contract Claim

Defendants argue that Counts 2 and 3, for intentional fraud and fraudulent concealment, respectively, arise from the same failed contractual relationship between FIS and MFS and are duplicative of the breach of contract claim.  Doc. 16 at 18–19.  They assert that the fraud claims are based on the following alleged facts and duties, all related to the contract:  the misrepresentation of delivery dates in the Services Agreement; fabrication of reasons to show Plaintiffs' breach of that agreement; and breach of the agreement by developing a rival platform.  *Id.*  In response, Plaintiffs reference allegations in the SAC describing fraudulent behavior by FIS as distinct from the breach of contract allegations.  Doc. 22 at 13 (citing Doc. 1-2 ¶¶ 18, 28, 35–36, 41, 44–45, 62, 65, 85).  The cited paragraphs detail the competition between FISERV and FIS, the events leading up to the signing of the Services Agreement, and the alleged promises FIS made to deliver a better platform than FISERV.

Ordinarily, under New York law, a fraud-based claim is not cognizable if the facts underlying it are the same as or related to those underlying a breach of contract claim.  *Minnie Rose LLC*, 169 F. Supp. 3d at 519.  Further, courts have held that "a contract claim cannot be converted into a fraud claim by the addition of an allegation that the

promisor intended not to perform when he made the promise." *Papa's-June Music, Inc.*
*v. McLean*, 921 F. Supp. 1154, 1160, 1162 (S.D.N.Y. 1996) (holding that merely
appending allegations about state of mind to the breach of contract claim is not sufficient
to give rise to distinct fraud claim).  Even if not sufficiently distinct, a fraud claim can
survive alongside a breach of contract claim if the alleged fraud falls into one of three
exceptions, under which "a plaintiff must either:  (i) demonstrate a legal duty separate
from the duty to perform under the contract, or (ii) demonstrate a fraudulent
misrepresentation collateral or extraneous to the contract, or (iii) seek special damages
that are caused by the misrepresentation and unrecoverable as contract damages."
*Bridgestone*, 98 F.3d at 20 (internal citations omitted).

     Here, Plaintiffs rely on the same underlying facts for Counts 2 and 3 of the SAC
as those related to Count 9, the breach of contract claim—that FIS never produced the
contract deliverables and instead fraudulently developed a similar platform for its own
use.  *Compare* Doc. 1-2 ¶¶ 190, 201 (describing the fraud as being related to the Services
Agreement, *with id.* ¶ 258 (alleging that Defendants breached "virtually each and every
clause of the Agreements").  Further, Plaintiffs' allegation that Defendants breached the
contract while making fraudulent statements of intent to perform is insufficient to support
a distinct fraud claim.  *Id.* ¶¶ 190–91, 201, 203; *see Papa's-June Music,* 921 F. Supp. at
1160–62 (granting a motion to dismiss a fraud claim as duplicative where plaintiff alleged
defendant did not intend to perform the contract); *see also Cougar Audio, Inc. v. Reich*,
No. 99 Civ. 4498 (LBS), 2000 WL 420546 at *6 & n.4 (S.D.N.Y. Apr. 18, 2000) (holding
that even if the defendant "never intended to honor" the contract, the breach of that
contract does not sound in fraud unless one of the *Bridgestone* exceptions applies).

     As to the first *Bridgestone* exception, to demonstrate a separate legal duty, such a
duty must be additional or distinct from the contractual duties.  *See Kriegel v. Donelli*,
No. 11 Civ. 9160 (ER), 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) (plaintiff

failed to allege that defendant owed any duty to plaintiff except as set forth in the agreement).

In the fraud claims at issue here, Plaintiffs do not assert that Defendants owed them a separate or independent duty apart from their alleged obligations to perform under the Services Agreement.  Doc. 1-2, ¶¶ 190–91, 201, 203.  Every instance of fraud is related to Defendants' duty to perform under the Agreement and not to develop a platform for their own use—a duty created by the terms of the contract.  *Id.*  In their response, Plaintiffs argue that Defendants had a duty to act in good faith and a duty to disclose the existence of Ambit Asset Finance.  Doc. 22 at 29–30.  As the Court will discuss below, the facts alleged do not give rise to a duty to disclose, and even if that duty existed, it would not be extraneous to the contract as Plaintiffs argue that it arises from the nature of their agreement.  And any duty of good faith is implied in the contract.  *See Nwagboli v. Teamwork Transp. Corp.*, No. 08 Civ. 4562 (JGK) (KNF), 2009 WL 4797777, at *6 (S.D.N.Y. Dec. 7, 2009) ("New York does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." (internal quotation marks and citation omitted)); *cf. Int'l Elecs., Inc. v. Media Syndication Glob., Inc.*, No. 02 Civ. 4274 (LAK), 2002 WL 1897661, at *2 (S.D.N.Y. Aug. 17, 2002) (holding that a duty to disclose extraneous to the contract arose only due to a relationship of trust and confidence between the entities and the defendant's position of superior knowledge).

The second exception—for collateral or extraneous misrepresentations that are actionable in fraud—is limited to "[m]isrepresentations of present facts made post-contract formation," which constitute more than a mere failure to perform a contractual obligation.  *Minnie Rose*, 169 F. Supp. 3d at 520–21 (finding that plaintiffs adequately alleged collateral misrepresentations by asserting that defendants actively concealed the true price every time they sent an invoice, amounting to more than a mere refusal to perform under the agreement); *see also Rojas v. Cigna Health & Life Ins. Co.*, No. 14

Civ. 6368 (KMK), 2018 WL 4759775, at *6–7 (S.D.N.Y. Sept. 29, 2018) (sustaining separate fraud counterclaims for plaintiffs' concealment of the actual price in bills for medical tests sent over an extended period of time pursuant to but collateral to the actual contract that was breached); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, No. 00 Civ. 9214 (RWS), 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003) (finding that complaint alleged defendant's involvement in affirmative misrepresentations and actively covering up fraud rather than mere concealment of breach of contract).[6]

Here, Plaintiffs make additional allegations in Counts 2 and 3 about misrepresentations collateral to the contract that may adequately support separate fraud claims based on the second *Bridgestone* exception.  Doc. 1-2 ¶¶ 190–91, 201, 203. Specifically, Plaintiffs allege that after the contract was signed, Defendants demanded additional payment from Plaintiffs, fabricated false reports of a breach by Plaintiffs as a reason to terminate the agreements, and misrepresented that they were still working on the platform.  *Id.*  Under the *Bridgestone* framework, these allegations rise to the level of ongoing affirmative misrepresentations, or misrepresentations of present facts.  *See*, *e.g.*, *Jordan*, 2003 WL 1751780, at *8 ("Misrepresentations made after a contract is entered into which relate to a present fact that would exist if the contract were performed, are collateral or extraneous to the contract with the Fund, and are actionable in fraud."); *Int'l Elecs.*, 2002 WL 1897661, at *2 (finding the defendant (1) induced plaintiff to disclose proprietary information and (2) deterred it from selling the product directly, through misrepresentations that it was performing under the contract, and that these deceptions were sufficiently distinct to be brought alongside a breach of contract claim).

---

[6] "In assessing whether alleged fraud is 'collateral or extraneous to the contract,' courts examine 'whether the alleged misrepresentation was warrantied or not mentioned by the contract; whether it was the misstatement of a present fact which induced entry into the contract; whether it constituted the failure to perform a duty specified in the contract; and whether it is generally duplicative of the breach of contract claim.'"  *Minnie Rose*, 169 F. Supp. 3d at 520 n.8 (citation omitted).

Accordingly, the fraud claims are not duplicative under the second *Bridgestone* exception and must be addressed on the merits.[7]

### 3.  Counts 4–8:  The Misappropriation and Unfair Competition Claims Are Duplicative of the Contract Claim

Defendants argue that the claims for misappropriation of trade secrets, unfair competition/deceptive business practices, misappropriation of confidential information, misappropriation of ideas, and misappropriation of skills "do not differ, in fact or substance, from the breach of contract claim" because they are based on contractual confidentiality obligations.  Doc. 16 at 16–17.  Plaintiffs respond that the Defendants unlawfully and deceptively used the information the Plaintiffs provided to them in connection with the Services Agreement, which is a unique allegation from the breach of contract claim.  Doc. 22 at 12–13.  Plaintiffs argue elsewhere in their response that the SAC's reference in these counts to a non-disclosure agreement ("NDA") or confidentiality agreement between Plaintiffs and Defendants was not to establish a breach of contract claim but rather to establish that the allegedly misappropriated information was confidential.  *Id.* at 30–31.

The analysis for whether a contract claim duplicates a misappropriation claim is much the same as the general tort rule that a plaintiff must allege the defendant breached a duty independent of those covered under a contract to hold the defendant liable in tort. *ScentSational Techs., LLC v. PepsiCo, Inc.*, No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017).  Specifically, a claim of misappropriation "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."  *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F. Supp. 2d 343, 353 (S.D.N.Y. 2010) (citation omitted).  And a claim of unfair competition does not survive if "its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations

---

[7] The Court therefore does not need to address whether the third *Bridgestone* exception applies.

asserted in the cause of action for breach of contract." *Orange Cnty. Choppers, Inc. v. Olaes Enterprises, Inc.*, 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007) (internal quotation marks and citation omitted).

Plaintiffs allege that they shared their trade secrets, confidential information, ideas, and skills with Defendants pursuant to an NDA and that Defendants misappropriated them to create Ambit Asset Finance. Doc. 1-2 ¶¶ 211–17, 222–30, 234–39, 243–45, 249–53. In their response, Plaintiffs explicitly argue that their misappropriation claims are grounded in a contract-based breach of the duty of good faith and fair dealing. Doc. 22 at 22–23. In every claim for Counts 4 through 8, the underlying relationship is created through the contract and is therefore duplicative of the breach of contract claim. *See, e.g.*, *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *9 (S.D.N.Y. Feb. 11, 2016) (noting that duplication hinged on the fact that the claims were based entirely on conduct that was proscribed by the NDA and no independent duty was alleged beyond the contractual relationship); *Sandrino v. Michaelson Assocs., LLC.*, No. 10 Civ. 7897 (BSJ), 2012 WL 5851135, at *10 (S.D.N.Y. Nov. 19, 2012) (dismissing misappropriation and unfair competition claims as repackaged allegations from the contract claim). Accordingly, Counts 4 through 8 are duplicative of the breach of contract claim.

**B. Each Claim Is Insufficiently Pleaded**

Even if each of the first eight claims could survive under the breach of contract duplication analysis, they—and the breach of contract claim—independently fail because they either do not meet the applicable pleading standards, do not adequately allege the required elements of the claim, are time-barred, or do not adequately establish standing.

*1. Count 1: The Tortious Interference Claim Is Insufficiently Pleaded*

Defendants argue that there is no cognizable claim for tortious interference with Plaintiffs' dealings with FISERV, and that the claim is time-barred and fails to put Defendants on notice as to which of the particular Plaintiffs were involved in the alleged

business dealings.  Doc. 16 at 28–30.  Plaintiffs do not respond to these arguments in their brief.  "A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."  *Tenemille v. Town of Ramapo*, No. 18 Civ. 724 (KMK), 2022 WL 126003, at *10 (S.D.N.Y. Jan. 13, 2022) (citation omitted).  This favors granting Defendants' motion to dismiss this claim.  But even considering the merits of the claim, the Court finds that Defendants' arguments are well supported.

　　　　*a.  Statute of Limitations*

　　First, Defendants argue that the claim is time-barred.  Doc. 16 at 29–30.  They identify four possible applicable laws:  (1) North Carolina, Doug McAllister's residence; (2) Delaware, where the non-contracting Plaintiffs are incorporated; (3) Virginia, the residence of MFS; or (4) New York, the residence of Random Holdings.  *Id.*  Defendants assert that North Carolina, Delaware, and New York have a three-year statute of limitations, while Virginia has a statute of limitations of five years.  *Id.*  For each of the four states, Defendants contend, a tortious interference claim accrues when the economic opportunity is lost due to the defendant's actions.  *Id.*  In this case, the prospective economic opportunity with FISERV was abandoned when FIS and MFS signed the Services Agreement on September 30, 2013.  *Id.* at 30.  Thus, any tortious interference claim has expired, according to Defendants.  *Id.*  Again, Plaintiffs do not respond to these arguments, effectively conceding this point.  *See Tenemille*, 2022 WL 126003, at *10.

　　The Court finds that the tortious interference claim is time-barred.  A three-year statute of limitations applies to tortious interference claims in New York, and "[e]ven if the underlying claims are based in contract, tortious interference still commands a three-year statute of limitations."  *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 451 (S.D.N.Y. 1998).  In New York, tortious interference claims accrue when the injury is sustained.  *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 627 (S.D.N.Y. 2014).  In North Carolina, the law is similar:  there is a three-year statute of limitations, and "a cause of action accrues (and the statute of limitations begins accruing)

when the wrong is complete." *Worrell v. A Woman's View, P.A.*, No. 18 Civ. 00178 (MOC) (DSC), 2019 WL 427336, at *2 (W.D.N.C. Feb. 4, 2019).  In Delaware, tortious interference claims also have a three-year statute of limitations, which "begins to run from the time the cause of action accrues." *Compagnie des Grands Hotels d'Afrique SA v. Starwood Cap. Grp. Glob. I LLC*, No. 18 Civ. 654 (SB) (SRF), 2021 WL 6883231, at *9 (D. Del. Feb. 10, 2021) (citation omitted).  Finally, in Virginia the statute of limitations is five years for tortious interference with contract or with business expectancy claims.  *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 321 (Va. 2014).

Here, the claimed tortious interference occurred when FIS allegedly fraudulently induced Plaintiffs to stop negotiating with FISERV, foreclosing that business opportunity when the Services Agreement with FIS was signed on September 30, 2013, more than nine years before this case was filed.  Doc. 1-2 ¶¶ 184–85.  Accordingly, the claim is time-barred under any statute of limitations that might apply.

   b.  *Sufficiency of the Tortious Interference Claim*

Even if it were not time-barred, the claim fails to plausibly allege tortious interference.  "The elements of tortious interference with contractual relations are (1) the existence of a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages to the plaintiff." *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 873 N.Y.S.2d 679, 682 (App. Div. 2009) (citation omitted).  As to the first element, tort law accords weaker protection if there is no existing contract and the alleged interference is merely with prospective contract rights.  *Id.* at 683; *see also NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996) (describing the determinative factor as the nature of the relationship that suffered the interference, with "greater deference accorded free competition where the contract rights are only prospective").  Accordingly, in order

18

to recover for interference with a pending relationship, Plaintiffs must allege "wrongful means" by Defendants.  *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980) (noting that wrongful means can include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," but "they do not . . . include persuasion alone although it is knowingly directed at interference with the contract").

Here, Plaintiffs acknowledge that there was never a contract with FISERV; rather they allege that they were "days away from signing a contract with FISERV."  Doc. 1-2 ¶ 41.  Plaintiffs must plead that Defendants used wrongful means to interfere with the pending relationship.  *Guard-Life Corp.*, 406 N.E.2d at 449.  Plaintiffs' claims that Defendants had no intent to follow through on their Services Agreement do not meet the standard required.  Doc. 1-2 ¶ 185.  But even if they did, Plaintiffs also fail to satisfy the third element of tortious interference, inducement of a third party to breach.  New York courts recognize that "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself but at the party with which the plaintiff has or seeks to have a relationship."  *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104 (N.Y. 2004).  Plaintiffs' claims do not plausibly allege that Defendants either induced FISERV—the third party—to abandon its pending agreement with Plaintiffs, or directed any of their conduct towards FISERV.  *See* Doc. 1-2 ¶ 185 (claiming instead that Defendants induced Plaintiffs to end their relationship with FISERV by beginning negotiations for their own contract).

The Court dismisses Count 1 on the basis that it is time-barred by any potentially applicable statute of limitations and that it does not plausibly allege tortious interference.

2.  *Counts 2–3:  The Fraud Claims Are Insufficiently Pleaded*

Defendants contend that Plaintiffs' claims for intentional fraud and fraudulent concealment are time-barred by the applicable statute of limitations and do not meet the heightened pleading standard for fraud required by Rule 9(b).  Doc. 16 at 30–33.

Plaintiffs respond that the SAC sufficiently pleads the elements of the fraud claims.  Doc. 22 at 28–30.

   *a.  Statute of Limitations*

   Defendants argue that either the New York or Virginia statute of limitations applies because MFS resides in Virginia and is the only Plaintiff party to the Services Agreement.  Doc. 16 at 32–33.  Defendants assert that under either statute of limitations, the fraud claims have expired.  *Id.*  Plaintiffs respond that the claims are timely under New York law, and that if Virginia or Florida law applies the claims would likewise survive—but they do not explain why.  Doc. 22 at 30.

   "[A] pre-answer motion to dismiss on [statute of limitations] ground[s] may be granted only if it is clear on the face of the complaint that the statute of limitations has run."  *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  The Court will not dismiss Plaintiffs' intentional fraud and fraudulent concealment claims due to the statute of limitations based on the allegations in the SAC.  Defendants argue that Plaintiffs were or should have been aware of the alleged fraud when Ambit Asset Finance was publicized in 2015.  Doc. 16 at 33.  In their response, Plaintiffs do not suggest an alternative date on which the claims accrued.  Doc. 22 at 30.  But the SAC's allegations indicate a series of fraudulent actions over the course of several years, through at least November 2016 and beyond.  Doc. 1-2 ¶¶ 194, 196, 202, 206.  As the Court discusses below, the fraud claims are deficient in several ways, including lacking the required particularity about when or where the fraudulent acts are alleged to have taken place.  Thus, it is not clear on the face of the SAC if the claims have expired.  *See Est. of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*, No. 14 Civ. 8751 (ER), 2015 WL 5660945, at *8 (S.D.N.Y. Sept. 25, 2015) (holding that the court was unable to dismiss the fraud claim on statute of limitations grounds because the complaint failed to establish when the plaintiff discovered or could have discovered the fraudulent acts).

   b.  *Sufficiency of the Fraud Claims*

   "To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015).  "The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made." *Trahan v. Lazar*, 457 F. Supp. 3d 323, 350 (S.D.N.Y. 2020) (citation omitted).

   "The elements of a fraudulent concealment claim under New York law are:  (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013) (citation omitted).  A duty to disclose can arise for a party to a business transaction "first, where the party has made a partial or ambiguous statement, . . . second, when the parties stand in a fiduciary or confidential relationship with each other, . . . and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (internal quotation marks and citation omitted).  Fraud and fraudulent concealment claims must be alleged with the particularity required to meet the heightened pleading standard of Rule 9(b).[8]

---

[8] Rule 9(b) requires that a complaint alleging fraud state the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Specifically, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (citation omitted).  Put differently, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (citation omitted).

Defendants challenge both fraud claims as not sufficiently differentiated as to the conduct of each party as required by Rule 9(b).  Doc. 16 at 31.  Indeed, the SAC merely refers to a series of fraudulent misrepresentations and actions over the course of business dealings without attributing specific actions to specific defendants or connecting those acts to a particular plaintiff.   Doc. 1-2 ¶¶ 190, 201.  In their response, Plaintiffs refer only to alleged email communications sent by Doug McAllister, one of the *plaintiffs*, as evidence of allegations of specific action by specific *defendants*.  Doc 22 at 28 (citing Doc. 1-2 ¶¶ 172–73).  According to the SAC, the email asked if FIS would "like to fulfil its agreement."  Doc. 1-2 ¶ 173.  McAllister allegedly sent the email because "Defendants were attempting to get Plaintiff to abandon the Agreements" and "Defendants were essentially forcing Plaintiffs to pay them extra millions."  *Id.*  These allegations are overly general with respect to the parties involved, which does not give rise to the "strong inference" required under Rule 9(b).  *See In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213 (S.D.N.Y. 2019) ("Generally, [s]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)." (alteration in original) (internal quotation marks and citation omitted)); *Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11 Civ. 3673 (RJS), 2012 WL 123989, at *8 (S.D.N.Y. Jan. 3, 2012) ("When a claim is brought against multiple defendants, Rule 9(b) requires that a plaintiff differentiate his allegations as to each defendant and inform each defendant separately of the specific allegations." (citation omitted)).

Defendants also argue that Plaintiffs fail to plead the material misrepresentations allegedly made for both the intentional fraud and fraudulent concealment claims.  Doc. 16 at 31.  Plaintiffs claim that Defendants made the following types of material misrepresentations:  first, Defendants allegedly assured Plaintiffs they were working on the contract deliverables but were instead purposefully concealing their diversion of resources away from Plaintiffs' project, Doc. 1-2 ¶¶ 112–13; second, Defendants allegedly generated phony invoices to demand payment from Plaintiffs to induce them to

terminate the Services Agreement, *id.* ¶¶ 142–49; and third, Defendants concealed the existence of Ambit Asset Finance through material misrepresentations, *id.* ¶ 193.  The misrepresentations offered by Plaintiffs are generic and wholly conclusory, without detail for each specific allegation, and so they do not meet the pleading standard of Rule 9(b). *See, e.g.*, *Seifts v. Consumer Health Solutions LLC*, 61 F. Supp. 3d 306, 324 (S.D.N.Y. 2014) (granting a motion to dismiss where plaintiffs failed to plead "which specific fraudulent statements were made to them, by whom, or where and when they were made" in a claim that defendants fraudulently induced plaintiffs to enter into a contract); *Golden Archer*, 2012 WL 123989, at *8 (dismissing fraud claims for failure to explain with particularity how defendants' alleged statements were false).  And as to the last allegation that Ambit Asset Finance was hidden from Plaintiffs, it does not meet the plausibility standard given that the platform was publicized to the general public and the industry through a press release, industry awards, and marketing materials.  Doc. 1-2 ¶¶ 138, 152–53, 159; *see also id.* at 169–70, 174–75, 177.

Further, Plaintiffs make merely conclusory statements about the fraudulent intent of Defendants.  *Id.* ¶¶ 193, 195, 203, 206.  Although scienter "need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a *strong inference* of fraudulent intent."  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012) (internal quotation marks and citation omitted). Plaintiffs' fraud claims center on their allegation that Defendants entered into the Services Agreement intending not to deliver, either because of a lack of capability or a desire to develop the technology platform for themselves.  Doc. 1-2 ¶¶ 190, 201.  But Plaintiffs fail to allege with particularity the factual basis supporting FIS' intent not to perform when it first executed the contract or during subsequent communications.  *Id.*; *see Stephenson*, 482 F. App'x at 622–23 (affirming dismissal where complaint failed to allege that defendant's conduct was reckless enough to raise a strong inference that it intended to deceive plaintiff).

Defendants also argue that the complaint fails to allege a duty to disclose the material allegedly concealed to successfully plead fraudulent concealment.  Doc. 16 at 32.  Plaintiffs do not plead any facts that would give rise to such a duty based on any partial statements by Defendants, a fiduciary relationship, or superior knowledge on Defendants' part.  *Cf. Brass*, 987 F.2d at 150 (listing those three categories as giving rise to a duty to disclose in the context of a business transaction).  The SAC does not allege that Defendants made partial or ambiguous statements that would necessitate disclosure of additional information.  Instead, in an attempt to establish a duty to disclose, Plaintiffs allege that there is a fiduciary relationship between Plaintiffs and Defendants as "[b]usiness collaborators."  Doc. 22 at 23.  They cite *Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928), where the court explained that "[j]oint adventurers, like copartners," owe one another "the duty of the finest loyalty."  *Id.* at 546.  Plaintiffs then assert that they "entered into a joint venture contract with Defendants to develop Plaintiffs' technology."  Doc. 22 at 23.  But this is a mischaracterization of the agreement here; as parties to a technology services agreement, the parties are neither partners nor joint venturers.  *See* Doc. 1-2 at 100 (providing that "[n]either FIS nor any of its representatives are an employee, partner or joint venturer of [MFS]").

Courts have also expanded the definition of fiduciary to include other kinds of relationships outside of a formal partnership.  *See Brass*, 987 F.2d at 151 (noting that informal relations of trust like those between friends, majority and minority stockholders, or a subsidiary and corporate entity can give rise to a duty to disclose).  Again, however, no such fiduciary relationship exists here.  *See AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 867 N.Y.S.2d 169, 181 (App. Div. 2008) (explaining that a "conventional business relationship," absent a showing of special circumstances, is insufficient to create a fiduciary relationship).

Additionally, a fraudulent concealment claim may be brought based on a business transaction where one party possessed superior knowledge that was not readily available

to the other.  *See Brass*, 987 F.2d at 150.  But Plaintiffs fail to allege that Defendants had superior knowledge—and with respect to the development of Ambit Asset Finance, that information was readily available.

The Court dismisses Counts 2 and 3 due to Plaintiffs' failure to meet the pleading requirements for fraud claims.

### 3.  Counts 4–8:  The Misappropriation Claims Are Time-Barred and Insufficiently Pleaded

Defendants argue that all the misappropriation claims are duplicative and should be analyzed together, including Count 5 (unfair competition) which is based on Defendants' alleged misappropriation of trade secrets.  Doc. 16 at 33–35.  Defendants also assert that the misappropriation claims are time-barred and inadequately pleaded.  *Id.* Plaintiffs concede that "[i]n analyzing the events of misappropriation as they relate to the unlawful taking of trade secrets, confidential information, and ideas, the analysis is the same," but they analyze the misappropriation of skill and unfair competition claims separately.  Doc. 22 at 22, 25.  Because the claims rest on the same facts, the Court will consider them together.  *See Yak v. BiggerPockets, L.L.C.*, No. 19 Civ. 05394 (PMH), 2020 WL 5505351, at *9 (S.D.N.Y. Sept. 10, 2020) (explaining that where misappropriation and unfair competition claims "are duplicative of each other, courts generally consider them to be a single cause of action" (citation omitted)).

### a.  Statute of Limitations

The misappropriation claims fail on statute of limitations grounds.  New York's statute of limitations for a misappropriation of trade secrets claim seeking monetary damages is three years, and the claim accrues when "a reasonably diligent person in plaintiffs position would have been put on inquiry as to the claim."  *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 50 (2d Cir. 2019) (internal

quotation marks and citation omitted).[9]  Defendants assert that Plaintiffs were on notice as to the existence of the replica platform no later than the failed mediation attempt in November 2017.  Doc. 16 at 34; *see also* Doc. 1-2 ¶¶ 173–74.  Plaintiffs respond that the claims are timely since the statute of limitations is extended with each "continued exploitation of the replica Platform."  *Id.* at 28.  The continuing tort doctrine, however, does not apply where the plaintiff had knowledge of the defendant's misappropriation and use of its trade secret.  *See VoiceOne Commc'ns, LLC v. Google Inc.*, No. 12 Civ. 9433 (PGG), 2014 WL 10936546, at *10 (S.D.N.Y. Mar. 31, 2014).

Plaintiffs acknowledge that they learned of the existence of Ambit Asset Finance on November 22, 2017, during the attempted mediation session.  Doc. 1-2 ¶¶ 173–74.  Accordingly, the misappropriation claims accrued in 2017.  *See VoiceOne*, 2014 WL 10936546, at *10 (finding that the misappropriation claim first accrued when the defendant disclosed the trade secret).  Plaintiffs' claims for misappropriation are thus time-barred.

### b.   *Sufficiency of the Misappropriation Claims*

Even if the claims were not time-barred, they would fail on the merits.  To state a claim for misappropriation of a trade secret, a plaintiff must allege:  "(1) that [he] possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Vogel v. TakeOne Network Corp.*, No. 22 Civ. 3991 (ER), 2023 WL 5276857, at *7 (S.D.N.Y. Aug. 16, 2023) (alteration in original) (citation omitted).[10]  Here, the claims

---

[9] Defendants cite New York law but then assert that North Carolina, Delaware, and Virginia law—the other potential sources based on the residences of Doug McAllister, the non-contracting Plaintiffs, and MFS—all impose the same three-year limitation period and specify that the claim accrues once the misappropriation is discovered or could have been discovered.  Doc. 16 at 34.

[10] The elements for pleading misappropriation of confidential information are much the same; any "distinction appears to be merely a formality, as [c]ourts often analyze misappropriation of trade secret and confidential information . . . claims together."  *Better Holdco, Inc. v. Beeline Loans, Inc*., 666 F. Supp. 3d 328, 394 (S.D.N.Y. 2023) (alteration and omission in original) (internal quotation marks and citation omitted).

for misappropriation of trade secrets, confidential information, ideas, and skills all refer to the trade secrets and ideas encompassed in the MAC SYSTEMS business model developed by Plaintiffs.  Doc. 1-2 ¶¶ 210, 234, 244, 248–50.  The unfair competition claim is tied to the same alleged trade secrets and ideas.  *Id.* ¶¶ 222–23.

Defendants argue that Plaintiffs have not specifically alleged a trade secret because they fail to identify what information was owned and what its value was.  *See Elsevier Inc. v. Doctor Evidence, LLC*, No. 17 Civ. 5540 (KBF), 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) (collecting cases explaining the level of particularity that is sufficient to survive a motion to dismiss a claim for misappropriation of trade secrets).[11] Plaintiffs make vague and conclusory statements describing MAC SYSTEMS as cutting-edge "business plan[s]," "technology," "business systems," and "methodology," with little meaningful detail about what any of this entails.  Doc. 1-2 ¶¶ 29, 48, 210, 223, 234, 244.  And Plaintiffs describe its value in equally general terms, explaining that the development of MAC SYSTEMS "took many years and the equivalent of millions in investment."  *Id.* ¶ 30.  These allegations are inadequate to plead the existence of a trade secret.  *See Elsevier*, 2018 WL 557906, at *6 (finding references to "methods" and "processes" without any detail about how those methods and processes functioned insufficient to plausibly support the existence of a trade secret).

The Court dismisses Counts 4, 5, 6, 7, and 8 as time-barred and as insufficiently pleaded.

---

[11] In determining whether information constitutes a trade secret, New York courts consider:  "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) (citation omitted).

4. *Count 9: The Breach of Contract Claim Is Insufficiently Pleaded*

Defendants argue that the breach of contract claim is deficient in a number of ways: it is time-barred; the non-contracting parties lack standing; and the claim is inadequately pleaded. Doc. 16 at 20–28. Plaintiffs concede that "[w]hile [the] SAC provides multiple instances of Defendants' breaching specific provisions of the relevant agreements," their breach of contract claim applies only to the September 2013 Services Agreement. Doc. 22 at 10.

a. *Statute of Limitations*

Defendants argue that any breach of contract claim is time-barred under the applicable statute of limitations of New York and Virginia. Doc. 16 at 21–26. According to Defendants, under New York's borrowing statute, the applicable statute of limitations is the shorter of either New York's or that of the jurisdiction where the claim accrued— which they assert is Virginia because it is the principal place of business of MFS, the only Plaintiff party to the Services Agreement. *Id.* at 22. Plaintiffs respond that the claim is timely under any statute of limitations because the breach of contract is ongoing. Doc. 22 at 18–20. They appear to concede that MFS' principal place of business is Virginia, noting only that Doug McAllister's signature for MFS on the agreement was electronically signed "with an IP address in Texas." *Id.* at 20.

In New York, the statute of limitations for breach of contract claims is six years, and the claim accrues when the breach occurs, not upon discovery of it. *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015) ("New York's six-year limitations period on contractual claims generally runs from the time the contract was breached."). In Virginia, the statute of limitations is five years, with the same accrual rule. *MartianCraft, LLC v. Brooks*, No. 22 Civ. 432 (LRL), 2023 WL 5165950, at *4 (E.D. Va. June 2, 2023), *report and recommendation adopted*, 2023 WL 4824917 (E.D. Va. July 27, 2023). New York permits a narrow exception to the rule that the statute of limitations accrues when the contract is first breached for claims "premised on a

continuing wrong" when the contract "imposes a continuing duty that is repeatedly breached." *Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 256 (S.D.N.Y. 2021) (citation omitted); *see also Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) ("If . . . a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew."). Virginia allows a theory of continuing breach to extend the statute of limitations only if "the wrongful acts are not continuous and occur only at intervals." *Am. Physical Therapy Ass'n v. Fed'n of State Boards of Physical Therapy*, 628 S.E.2d 928, 929 (Va. 2006) (internal quotation marks and citation omitted).

The SAC presents multiple potential dates for the breaches of contract:  either early 2015, when FIS allegedly began distributing Ambit Asset Finance, Doc. 1-2 ¶ 102, or continuing dates between 2013 and 2016, when FIS allegedly failed to deliver the New Auto Fintech Platform, *id.* ¶¶ 74, 87, 97, 101, 111.  If the breach is the distribution of Ambit Asset Finance, then the claim is untimely under both the New York and Virginia statutes of limitation because the platform allegedly was first distributed in 2015.  *Id.* ¶ 102.  If the breach is construed as FIS' alleged failure to deliver the New Auto Fintech Platform, then subsequent failures to deliver are not sufficient to constitute additional new breaches that would renew the statute of limitations under Virginia law.  *See Westminster Inv. Corp. v. Lamps Unlimited, Inc.*, 379 S.E.2d 316, 319 (Va. 1989) (rejecting continuous breach theory based on landlord's continuing failure to enforce a contract provision and holding that the statute of limitations ran from the date of the initial breach).  And if New York law applied, a theory of continuing wrong from Defendants' ongoing failure to deliver would not succeed either.  *See Comm Trade USA, Inc. v. INTL FCStone, Inc.*, No. 13 Civ. 3998 (KBF), 2014 WL 787912, at *9 (S.D.N.Y. Feb. 27, 2014) ("To the extent that plaintiff asserts simply an ongoing breach of the contract—with damages increasing as the breach continued—the continuing wrong theory does not apply."); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (explaining that

plaintiffs could not rely on the continuing wrong theory for an "ongoing" violation because "performance under the contract merely affects damages and does not give rise to a new cause of action"). So regardless of how the breach is characterized, the claim is time-barred under both New York and Virginia law.

       *b.   Standing*

       Defendants argue that the Services Agreement was between only MFS and FIS, and thus none of the other plaintiffs have standing to bring a breach of contract claim. Doc. 16 at 21. Plaintiffs respond that the other plaintiffs have demonstrated their legitimate interest as third parties affected by the contract and that they were "all part of the same plan and collaborated on the same project. . . . [T]hey were the companies working together to perform." Doc. 22 at 14–15. In order for non-contracting parties to have standing to sue, they must be intended third-party beneficiaries of the contract. *Veleron Holding, B.V. v. BNP Paribas SA*, No. 12 Civ. 5966 (CM), 2014 WL 12699263, at *20 (S.D.N.Y. Apr. 16, 2014). "The terms contained in the contract must *clearly evince* an intention to benefit the third person who seeks the protection of the contractual provisions." *Id.* (citation omitted). The fact that another party may incidentally benefit from the agreement does not mean it was intended to be a third-party beneficiary. *Id.* at *21.

       Here, Plaintiffs point to no provision of the Services Agreement or any surrounding circumstances that clearly evincing an intent to benefit these plaintiffs. *See, e.g.*, Doc. 1-2 ¶¶ 42, 81 (alleging without further specificity that all Plaintiffs were involved in the work). As the SAC fails to refer to any individual plaintiff in the development of the MAC SYSTEMS model, it is impossible to say which plaintiffs contributed what. *Cf. Veleron Holding*, 2014 WL 12699263, at *21 (finding no intended third-party beneficiaries in the absence of clear evidence that the parties intended for them to benefit from the agreement). And in fact, the press release announcing the Services Agreement references only FIS' agreement to provide services to MFS. Doc. 1-

2 at 91.  Given that only one plaintiff was party to the contract, the non-contracting

plaintiffs have not plausibly alleged that they have standing.  Thus, Random Holdings,

DM Manager, McAllister Acceptance Corporation, Motor Acceptance Company, and

Doug McAllister do not have standing for a breach of contract claim arising from the

September 2013 Services Agreement.

     *c.  Sufficiency of the Breach of Contract Claim*

     Defendants further assert that Plaintiffs have failed to adequately plead a breach

of contract claim because they do not identify any specific contractual provision that was

breached, and there are no allegations whatsoever as to Fidelity National Information

Services, Inc., one of the named defendants.  Doc. 16 at 26–27.  Plaintiffs concede that

the breach of contract claim relates only to the September 2013 Services Agreement.

Doc. 22 at 10.  But they argue that "Plaintiffs have met the pleading standard for a breach

of contract by alleging that the Defendants entered into agreements, materially breached

these agreements, have continued to breach these agreements, and the breach is the cause

of continuing damages against the Plaintiffs."  *Id.* at 11 (internal citations omitted).

     "To state a claim in federal court for breach of contract under New York law, a

complaint need only allege (1) the existence of an agreement, (2) adequate performance

of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."

*Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  "When pleading these elements,

a plaintiff must identify the specific provision of the contract that was breached as a result

of the acts at issue."  *Wolff v. Rare Medium, Inc*., 210 F. Supp. 2d 490, 494 (S.D.N.Y.

2002).  Here, Plaintiffs' statements are overly general with respect to the provisions

allegedly breached and with respect to which defendants are alleged to have breached

them.  In their response to the motion to dismiss, Plaintiffs attempt to cure this deficiency

by referencing directly two provisions of the Services Agreement and its associated Auto

Finance Processing Services Addendum that Defendants allegedly breached:  sections 2.6

and 18.  Doc. 22 at 10.  Section 2.6 is a disaster recovery provision that is irrelevant to

the matters before the Court.  Doc. 1-2 at 95.  Section 18 presumably refers to section
18.1 in the amendment to the Services Agreement.  *Id.* at 129.  That provision does not
grant MFS an exclusive customer base but rather forecloses FIS from soliciting business
from any competitor of MFS.  *Id.*  As Defendants observe, a "plain reading of [the]
provision confirms the claim is not credible."  Doc. 23 at 6.  Thus, Plaintiffs' attempts to
identify the relevant sections of the contract with greater specificity do not cure the
insufficiencies.

The Court dismisses Count 9 because it is time-barred and insufficiently pleaded
and because the non-contracting Plaintiffs lack standing.[12]

### C.  Leave to Amend

While the Court has dismissed all claims against Defendants, it will grant
Plaintiffs leave to amend their complaint with respect to the intentional fraud claim.
Courts must "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P.
15(a)(2).  But leave to amend is unwarranted where "the problem with [the] claims is
'substantive' and, thus, 'better pleading will not cure it.'"  *Gayle v. Larko*, No. 18 Civ.
3773 (ER), 2019 WL 4450551, at *4 (S.D.N.Y. Sept. 17, 2019) (quoting *Cuoco v.
Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).  In other words, leave to amend may be
denied where it would be futile.  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d
Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be
productive . . . it is not an abuse of discretion to deny leave to amend."  And leave to
amend may be denied where a party cannot cure the deficiencies "without contradicting
the allegations of the original Complaint."  *Cobalt Multifamily Invs. I, LLC v. Shapiro*,
857 F. Supp. 2d 419, 440 (S.D.N.Y. 2012).

Here, the tortious interference (Count 1), fraudulent concealment (Count 3),
misappropriation (Counts 4 through 8), and breach of contract (Count 9) claims are

---

[12] Because the Court grants the motion to dismiss, it does not address Defendants' alternative argument that
the case should be transferred to the Middle District of Florida.

dismissed with prejudice because they are either time-barred or have deficiencies that could not be cured by amendment without contradicting the SAC.  However, the Court will permit Plaintiffs to replead the claim for intentional fraud (Count 2) because it is not clear from the face of the SAC that the claim is time-barred.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  All claims are dismissed with prejudice except for the intentional fraud claim.  Plaintiffs may file an amended complaint with respect to that claim by April 19, 2024.  If they fail to do so, that claim will also be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 15.

It is SO ORDERED.

Dated:    March 29, 2024
          New York, New York

_____
     EDGARDO RAMOS, U.S.D.J.